**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


Henry William Belcher

    v.                                          Case No. 15-cv-62-JL

Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration


**<u>REPORT AND RECOMMENDATION</u>**


Pursuant to 42 U.S.C. § 405(g), Henry Belcher moves to reverse the Acting Commissioner's decision to deny his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423.  The Acting Commissioner, in turn, moves for an order affirming her decision.  For the reasons that follow, I recommend that this matter be remanded to the Acting Commissioner for further proceedings.

## I. <u>Standard of Review</u>

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of
social security disability benefits unless 'the [Acting
Commissioner] has committed a legal or factual error in
evaluating a particular claim.'"  <u>Manso-Pizarro v. Sec'y of HHS</u>,
76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting <u>Sullivan v.</u>
<u>Hudson</u>, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting
Commissioner's findings of fact be supported by substantial
evidence, "[t]he substantial evidence test applies not only to
findings of basic evidentiary facts, but also to inferences and
conclusions drawn from such facts." <u>Alexandrou v. Sullivan</u>, 764
F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing <u>Levine v. Gardner</u>,
360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial
evidence is 'more than [a] mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion.'" <u>Currier v. Sec'y of HEW</u>, 612 F.2d
594, 597 (1st Cir. 1980) (quoting <u>Richardson v. Perales</u>, 402
U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the
[Acting Commissioner] to determine issues of credibility and to
draw inferences from the record evidence.  Indeed, the
resolution of conflicts in the evidence is for the [Acting

Commissioner], not the courts." <u>Irlanda Ortiz v. Sec'y of HHS</u>,
955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations
omitted).  Moreover, the court "must uphold the [Acting
Commissioner's] conclusion, even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence." <u>Tsarelka v. Sec'y of HHS</u>, 842 F.2d 529,
535 (1st Cir. 1988) (per curiam).  Finally, when determining
whether a decision of the Acting Commissioner is supported by
substantial evidence, the court must "review[] the evidence in
the record as a whole." <u>Irlanda Ortiz</u>, 955 F.2d at 769 (quoting
<u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).


## II. <u>Background</u>

The parties have submitted a Joint Statement of Material
Facts.  That statement, doc. no. 12, is part of the court's
record and will be summarized here, rather than repeated in
full.

Belcher has a 10th-grade education and worked in
construction until 2004.  At his hearing before an
Administrative Law Judge ("ALJ"), Belcher testified that in
2004, "both of [his] knees started giving out . . . and [he]
kept doing as best [he could] to work, all the way up until [he]

couldn't do it anymore."  Administrative Transcript (hereinafter

"Tr.") 33.  He last engaged in substantial gainful activity in

2004.

In April of 2009, Belcher fell off a ladder and broke six

ribs.  At his hearing, Belcher testified that "when [he] was

getting up on the ladder on the roof, [his] right knee gave out

and [he] fell off the ladder and the roof."[1]  Tr. 31; see also

id. at 39 ("The knee gave out.").  After his fall, Belcher was

taken to the hospital and received treatment for his broken

ribs.  While his treating physicians noted a leg injury he

sustained in 1980, see Tr. 181, 187, he received no diagnosis or

treatment related to either his previously injured leg or the

knee he says gave out.

Belcher's eligibility for disability insurance benefits

expired on March 31, 2010.  At Belcher's hearing, the following

exchange took place between Belcher and the ALJ:

> Q  . . . So, thinking back to around 2010, where

---

[1] The Acting Commissioner characterizes Belcher's testimony
this way: "Indeed, Plaintiff's hearing testimony was that he
slipped, not that his knee gave out."  Resp't's Mem. of Law
(doc. no. 11-1) 9 (citing Tr. 31).  While several medical
professionals who treated Belcher after his fall characterized
the fall as being caused by a slip, see Tr. 181, 184, Belcher
himself testified that he fell because his knee gave out.  See
Tr. 31, 39.  The Acting Commissioner's mischaracterization of
Belcher's hearing testimony necessarily undercuts her use of
that testimony to impugn Belcher's credibility.

physically were you?  Were you able to go for a walk,
or how were you not?

     A  No.  I, tried to walk . . . let's see.  I'm
going to go with 40-foot ladders (INAUDIBLE], 80, 120
feet, I've got to, I've got to sit down.  Maybe 80
feet.

     Q  Okay.  And, now –

     A  And the knees are constantly burning.

     Q  Okay, and what happens with the knees?

     A  They pop.  My right one would pop out; then,
I'd have to turn and twist it so it would pop back in.
And they would burn.  And I just, you know, it's just,
I have to sit down.

Tr. 33.

In June of 2011, Belcher saw Margie Riforgiato, an advanced
practice registered nurse, for a follow-up visit related to
hypertension.  He reported pain in both knees.  Nurse Riforgiato
noted that Belcher walked with a limp, that his right leg was
shorter than his left leg, that his right leg had not been set
correctly after he broke it in 1980, and that he had a bony
deformity in one of his legs.  She recommended that Belcher
exercise, "but watch stress on [his] knees."  Tr. 208.

In March of 2012, after a follow-up visit for hypertension
and bilateral osteoarthritis with Nurse Riforgiato, she reported
the following history:

> Biggest concern is his knees.  States [he] can't work
> anymore.  Was a painter & drywaller & now cannot do
> ladders or stairs.  Very stiff in the morning.  Knees
> [s]ensitive to damp weather or rain coming.  Taking
> Ibuprophen 800 mg . . .

Tr. 205.  She also noted Belcher's report that his knees had

been painful for three years.  On examination, Nurse Riforgiato

detected crepitus[2] in both of Belcher's knees, but neither

erythema[3] nor elevated warmth.  She recommended that Belcher be

seen by an orthopedist for his knees and perhaps get an MRI.

About a month later, Belcher made a report to Nurse

Riforgiato that she described this way:

> Exercising by walking more.  Continues to have alot of
> knee pain from years of kneeling and climbing ladders
> as painter & drywaller.  Not taking any NSAIDS[4] or meds
> for knees . . . doesn't like taking pills.

Tr. 202.  Upon examination, Nurse Riforgiato again noted

bilateral crepitus and a lack of erythema, and also observed

that Belcher had a full range of movement in his knees and no

---

[2] "Crepitus" is "the grating of a joint, often in
association with osteoarthritis."  Stedman's Medical Dictionary
457 (28th ed. 2006).

[3] "Erythema" is "redness due to capillary dilation, usually
signaling a pathologic condition (e.g., inflammation,
infection."  Stedman's, supra note 2, at 666.

[4] "NSAIDs" is an "[a]bbreviation for nonsteroidal anti-
inflammatory drugs, . . . e.g., aspirin, ibuprofen."  Stedman's,
supra note 2, at 1334.

swelling.  She recommended an orthopedic referral and/or a referral for physical therapy.

On June 21, 2012, Belcher Applied to the Social Security Administration ("SSA") for both disability insurance benefits ("DIB") and supplemental security income ("SSI").  In each application, he claimed that he was disabled by bilateral knee osteoarthritis, and claimed an onset date of October 15, 2008.

Belcher saw Nurse Riforgiato again in June, July, and August of 2012, complaining of knee pain.  Between his June and July visits, he had x-rays taken of both knees.  The radiologist, Dr. John Kustan, made the following findings concerning Belcher's right knee: (1) "severe lateral tibiofemoral compartment narrowing with subcortical sclerosis and marginal spurring," Tr. 213; (2) a "[n]ormal medial tibiofemoral compartment," id.; (3) "mild patellofemoral joint space narrowing," id.; (4) "a joint effusion," id.; (5) "a congenitally large fabella," id.; and (6) "no fractures or intrinsic bony lesions," id.  He gave the following impression: "Lateral tibiofemoral compartment and patellofemoral arthrosis and a joint effusion."[5]  Id.  Dr. Kustan made the following

---

[5] "Arthrosis" is defined as "[d]egenerative joint changes," Stedman's, supra note 2, at 162, and is a synonym for osteoarthritis, see id.  Joint effusion is "increased fluid in

findings concerning Belcher's left knee: (1) "severe medial tibiofemoral compartment narrowing" Tr. 214; (2) a "[n]ormal lateral tibiofemoral compartment," id.; (3) "moderate patellofemoral joint space narrowing," id.; (4) "a joint effusion," id.; and (5) "no fractures or intrinsic bony lesions," id.  He gave the following impression: "Medial tibiofemoral compartment and patellofemoral arthrosis and a joint effusion."  Id.

About a month after Dr. Kustan authored his radiology reports on Belcher's knees, Belcher was seen in the orthopedics department at Memorial Hospital, complaining of bilateral knee pain.  There, he was examined by Dr. Douglas Taylor and a physician's assistant, Patrick Maguire.  The office note generated by that visit includes the following statement:

**X-Ray Interpretation**

Of the Right knee shows significant degenerative changes with valgus deformity.  No fracture, dislocation or subluxation.[6]

Of the left knee shows significant degenerative changes with significant varus deformity.  No

---

[the] synovial cavity of a joint."  Id. at 616.

[6] "Valgus" is a "Latin adjective describing any joint in an extremity that is deformed such that the more distal of the two bones forming the joint deviates away from the midline, as in knock-knee."  Stedman's, supra note 2, at 2085.

8

fracture, dislocation or subluxation.[7]

Tr. 227 (emphasis added).  Dr. Taylor and Mr. Maguire concluded their note by recommending total knee replacement.

In July of 2012, Nurse Riforgiato completed a Residual Functional Capacity ("RFC") Questionnaire for Belcher.[8]  In it, she noted the diagnoses from Dr. Kustan's radiology reports and listed the following symptoms, which she described as constant: "knee pain, decreased mobility, numbness in feet, tingling & burning R > L, legs/feet, poor sleep, inability to sit or stand > 30 min 2° pain & stiffness legs/knees R > L."  Tr. 219.  With regard to Belcher's RFC, Nurse Riforgiato opined that Belcher could: (1) sit for 30 minutes at a time and two hours in an eight-hour workday; (2) stand/walk for 30 minutes at a time and two hours in an eight-hour workday, with frequent breaks; and (3) occasionally lift less than 10 pounds but never lift more than that.  She also opined that Belcher: (1) needed to lie down

---

[7] "Varus" is a "Latin adjective describing any joint in an extremity that is deformed such that the more distal of the two bones forming the joint deviates toward the midline, as in bowleg."  Stedman's, supra note 2, at 2091.

[8] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

for more than 60 minutes during a workday; (2) needed to take unscheduled 20 minute breaks every 30 minutes; and (3) was likely to be absent from work three or four times a month as a result of his impairments or treatment for them.  She did not, however, indicate how long Belcher had been in the condition she described.

In October of 2012, state agency consultant Dr. Hugh Fairley assessed Belcher's RFC for the period from June 21, 2012 through the date of his assessment.  Among other things, he determined that Belcher could: (1) sit, with normal breaks, for about six hours in an eight-hour workday; (2) stand/walk, with normal breaks, for about two hours in an eight-hour workday; and (3) frequently lift and/or carry 10 pounds.  In addition, Dr. Fairley determined that there was insufficient medical evidence to assess Belcher's RFC prior to June 21, 2012.

In June 2013, Nurse Riforgiato completed a second RFC Questionnaire for Belcher.  In it, she gave Belcher an RFC that was even more restricted than the RFC than in her first questionnaire, one that is incompatible with full-time work.  But, again, she did not indicate how long Belcher had been in that condition.  Three months later, Nurse Riforgiato completed a third RFC Questionnaire along with an Onset Date

Questionnaire.  Again, she assigned Belcher an RFC that is
incompatible with full-time work.  In addition, she had this to
say about Belcher's onset date:

> I have treated this patient since March 10, 2011.  It
> is my opinion that my patient has had the limitations
> and restrictions outlined in the Residual Functional
> Capacity Questionnaire since 3/10/11.  Per his report,
> his knee pain and DJD[9] has progressed since 5/2000.

Tr. 290.

Based upon Dr. Fairley's finding that Belcher had the RFC
to perform only sedentary work,[10] along with his age, education,
and previous work experience, the SSA determined that Belcher
was disabled as of June 21, 2012, the date of his applications.
On that basis, he was awarded SSI.  But, because he was last
insured for DIB on March 31, 2010, and the record was
insufficient to establish Belcher's RFC at any point prior to
June 21, 2012, the SSA determined that he was not disabled for
the purposes of eligibility for DIB.

Belcher appealed his denial of DIB.  After Belcher's
hearing, the ALJ issued a decision that includes the following

---

[9] "DJD" is an "[a]bbreviation for "degenerative joint
disease."  Stedman's, supra note 2, at 577.

[10] Under the applicable regulations, "[s]edentary work
involves lifting no more than 10 pounds at a time and
occasionally carrying articles like docket files, ledgers, and
small tools."  20 C.F.R. § 404.1567(a).

relevant findings of fact and conclusions of law:

> 3.  The evidence does not establish [that] the
> claimant was suffering from any severe medically
> determinable impairment prior to the established onset
> date of June 21, 2012 (20 CFR 404.1521 et seq. and
> 416.921 et seq.).
>
> . . . .
>
> 4.  The claimant did not have an impairment or
> combination of impairments that significantly limited
> his ability to perform basic work-related activities
> for 12 consecutive months prior to the established
> onset date of June 21, 2012; therefore, the claimant
> did not have a severe impairment or combination of
> impairments prior to that date (20 CFR 404.1521 et
> seq. and 416.921 et seq.).

Tr. 19.  In reaching that decision, the ALJ found that "there

[was] no substantial medical evidence in the record establishing

[that] the claimant was suffering from any severe impairment

prior to [June 21, 2012]."  Tr. 20.  In making that finding, the

ALJ stated that "[t]he non-examining State agency medical

consultant, Hugh Fairley, M.D., concluded that there was

insufficient evidence to render an opinion as to the severity of

the claimant's bilateral knee condition prior to the expiration

of his date last insured."  Tr. 21.


### III.  Discussion

#### A.    The Legal Framework

To be eligible for disability insurance benefits, a person

must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  Moreover, "a '[c]laimant is not entitled to [DIB] unless [he] can demonstrate that [his] disability existed prior to the expiration of [his] insured status,' i.e. [his] date last insured." Sullivan v. Colvin, No. 14-cv-06-JL, 2015 WL 1097404, at *1 (D.N.H. Mar. 11, 2005) (quoting Cruz Rivera v. Sec'y of HHS, 818 F.2d 96, 97 (1st Cir. 1986).  The only question in this case is whether Belcher was under a disability at any time prior to March 31, 2010, the last date on which he was insured for DIB.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

**B.  Belcher's Claims**

Belcher claims that this case should be remanded because

the ALJ erred by failing to consult with a medical expert before

determining that he was not disabled prior to June 21, 2012.

The court agrees.

The key issue in this case is the onset date of the

disability that entitled Belcher to SSI.  "The onset date of

disability is the first day an individual is disabled as defined in the Act and the regulations."  Social Security Ruling ("SSR") 83-20, 1983 WL 31249, at *1 (1983).  With respect to determining the onset date for a disability of nontraumatic origin, such as Belcher's knee condition, SSR 83-20 explains, in pertinent part:

> Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability.  The medical evidence serves as the primary element in the onset determination.  . . .
>
> . . .  Determining the proper onset date is particularly difficult when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomology of the disease process.
>
> . . . .
>
> . . .  How long [an impairment] may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medial basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. . . .
>
> . . . .
>
> . . .  The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in [substantial gainful activity] for a continuous period of at least 12 months or result in death.  Convincing rationale must be given for the date selected.

Id. at *2-3.

Here, "the alleged onset and the date last worked are far
in the past and adequate medical records are not available."
SSR 83-20, 1983 WL 31249, at *2.  Thus, it was necessary for the
ALJ to infer the onset date.

"When an ALJ determines that a claimant suffers from a
present disability but the onset date of the disability must be
inferred from ambiguous evidence, courts agree that the ALJ must
consult with a medical advisor before denying a claim for
benefits."  Warneka v. Colvin, No. 14-cv-00022-PB, 2015 WL
1470955, at *3 (D.N.H. Mar. 31, 2015) (citing Walton v. Halter,
243 F.3d 703, 709 (3d Cir. 2001); Grebenick v. Chater, 121 F.3d
1193, 1201 (8th Cir. 1997); Bailey v. Chater, 68 F.3d 75, 79
(4th Cir. 1995); see also May v. SSA Comm'r, 125 F.3d 841, 1997
WL 616196, at *1 (1st Cir. 1997) (unpublished per curiam table
decision).  "[C]onsultation with a medical advisor is required
'in all but the most plain cases.'"  Alton v. Colvin, No. 14-cv-
41-LM, 2015 WL 1000359, at *4 (D.N.H. Mar. 6, 2015) (quoting
Fischer v. Colvin, No. 13-cv-00463-PB, 2014 WL 5502922, at *6
(D.N.H. Oct. 30, 2014)).  Such consultation "may be dispensed
with only 'if the record provides unambiguous evidence that the
claimant did not become disabled as of the date last insured.'"

_Alton_, 2015 WL 1000359, at *4 (quoting _Fischer_, 2014 WL 5502922, at *6.  Finally,

> [a] claimant's date of disability onset is free from ambiguity only if

>> no legitimate basis in the record can support an inference of disability as of the date last insured. . . .  Thus, even a record that furnishes only weak support for a claim remains ambiguous, and therefore requires consultation with a medical advisor, if it could support any reasonable inference of disability prior to the date last insured.

> _Fischer_, 2014 WL 5502922, at *6 (quoting _Mason v. Apfel_, 2 F. Supp. 2d 142, 149 (D. Mass. 1998)).

_Alton_, 2015 WL 1000359, at *4.

The Acting Commissioner acknowledges the foregoing legal principles, but argues that there is no legitimate basis in the record to support an inference that Belcher was disabled on or before March 31, 2010.  While the record may be weak, this is not a case where the record cannot "support _any_ reasonable inference of disability prior to the date last insured."  _Alton_, 2015 WL 1000359, at *4 (emphasis added).  Thus, the evidence concerning Belcher's onset date is ambiguous.

As of the date on which Belcher was last insured for DIB, he had worked for approximately 30 years in in construction, an occupation that might reasonably be expected to damage his knees.  At his hearing, he testified that he continued working

17

in construction until he could no longer do so, due to pain in his knees.  He also testified that in 2009, nearly a year before his coverage for DIB expired, his right knee gave out while he was at work, climbing a ladder.[11]

It is true that the first medical record documenting treatment for Belcher's knees is dated approximately a year after his date last insured.  And, the first x-rays of his knees were taken a year after that.  Thus, there are no medical records created before Belcher's date last insured that establish a severe impairment.  But, as the Acting Commissioner acknowledges, "[m]edical evidence generated after a claimant's insured status expires may be considered for what light (if any) it sheds on the question whether the claimant's impairment(s) reached disabling severity before claimant's insured status expired."  Rivera v. Sec'y of HHS, 19 F.3d 1427, 1994 WL 107870, at *5 (1st Cir. 1994) (unpublished per curiam table decision) (emphasis in the original) (citing Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988); Basinger v. Heckler, 725 F.2d 1166,

---

[11] Belcher's testimony that he was at work in 2009 is not inconsistent with his testimony that he stopped working in 2004. He explained at his hearing, that he "tried to get back to work [in 2009] because [he] was so bored and [he needed money], Tr. 31, but further explained that his attempt to work lasted "about a week, and [he] couldn't even finish the job," id.

18

1169 (8th Cir. 1984)(collecting cases); <u>Gonzalez v. Sec'y of</u>
<u>HHS</u>, 757 F. Supp. 130, 134 (D.P.R. 1991); <u>Alcaide v. Sec'y of</u>
<u>HHS</u>, 601 F. Supp. 669, 672-73 (D.P.R. 1985).

Here, Belcher's post-expiration medical records include the
aforementioned x-rays, which led to a diagnosis of "<u>significant</u>
<u>degenerative changes</u> to his knees bilaterally."  Tr. 227
(emphasis added).  Because degenerative changes are, by
definition, changes that have occurred over time, and given the
characterization of Belcher's degenerative changes as
"significant," the court cannot say that there is no legitimate
basis on which to base an inference that Belcher was disabled by
his knee condition before March 31, 2010.  That is, "the record
does not unambiguously establish that [Belcher] was not disabled
as of [his] date last insured."  <u>Alton</u>, 2015 WL 1000359, at *5.
Accordingly, the ALJ should have called on the services of a
medical advisor to assist him in inferring an onset date.

As the court has noted, SSR 83-20 explains that "medical
evidence serves as the primary element in the onset
determination."  1983 WL 31249, at *2.  Here, there is medical
evidence in the form of Dr. Kustan's radiology reports, the
diagnoses of "significant degenerative changes" that resulted
from them, and Dr. Taylor's recommendation that Belcher undergo

a total knee replacement.  The ALJ did not address any of that evidence in his decision.  Moreover, as Judge Laplante has explained, SSR 83-20 "by its own terms, functions to prevent an ALJ from identifying the onset date of a claimant's disability based on the ALJ's lay interpretation of medical records." Sullivan, 2015 WL 1097404, at *2.  In short, under the circumstances of this case, the ALJ erred by not calling upon the services of a medical advisor to assist in inferring the onset date for Belcher's disability.

That conclusion is reinforced by the explanation the ALJ gave for his determination that Belcher's onset date did not predate June 21, 2012.  Notwithstanding the guidance provided by SSR 83-20, he did not use "medical evidence . . . as the primary element in [his] onset determination."  1983 WL 31249, at *2. He did, however, give great weight to Dr. Fairley's opinion. But, Dr. Fairley did not give an opinion on Belcher's onset date, nor did he opine that Belcher had an RFC before June 21, 2012, that was consistent with an ability to work.  Rather, Dr. Fairley opined that there was insufficient evidence to determine Belcher's RFC at any point prior to June 21, 2012.  As SSR 83-20 explains, the unavailability of medical records is one of the factors that triggers the need for an ALJ to call upon the

services of a medical advisor.  In this case, a medical advisor
might be able to offer an informed judgment concerning the
functional effects, retrospectively, of the significant
degenerative conditions diagnosed by Drs. Kustan and Taylor in
June of 2012.

Finally, the Acting Commissioner argues that even if the
ALJ erred by failing to call on the services of a medical
advisor, a remand in this case would be an empty exercise, given
the inability of either Dr. Fairley or Nurse Riforgiato to
establish that Belcher had a disabling condition prior to his
date last insured.  The court is not so sure about that.  First,
Dr. Fairley's statement that he could not determine Belcher's
RFC prior to June 21, 2012, is not the same thing as saying that
he could not determine the onset date of Belcher's disabling
condition.  With regard to Belcher's established onset date, the
court notes that there is nothing medical about June 21, 2012;
it is merely the date on which Belcher applied for DIB and SSI.
With regard to Nurse Riforgiato's Onset Date Questionnaire, the
Acting Commissioner interprets Nurse Riforgiato's response as
indicating an inability to identify an onset date prior to
Belcher's date last insured.  But, at the same time, she did
indicate an onset date earlier than June 21, 2012, and the fact

that her onset date coincides with the day she started treating Belcher suggests that she may have understood the form as limiting her opinions to the period when she was treating Belcher, rather than allowing her to give an onset date that predated her treatment of Belcher.

In the end, it is a close call.  But on balance, the better result in this case is to remand it to the ALJ, with instructions that he call upon a medical advisor to establish the onset date of Belcher's disability.


## IV.  Conclusion

For the reasons given, I recommend that the Acting Commissioner's motion for an order affirming her decision (doc. no. 11) be denied, and Belcher's motion to reverse that decision, (doc. no. 9) be granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

Any objections to this Report and Recommendation must be filed within 14 days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57

(1st Cir. 2011), <u>cert.</u> <u>denied</u>, 132 S. Ct. 1045 (2012); <u>Sch.</u>
<u>Union No. 37 v. United Nat'l Ins. Co.</u>, 617 F.3d 554, 564 (1st
Cir. 2010) (only issues fairly raised by objections to
magistrate judge's report are subject to review by district
court; issues not preserved by such objection are precluded on
appeal).

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

November 13, 2015

cc:  Laurie Alice Smith, Esq.
     D. Lance Tillinghast, Esq.
     Robert J. Rabuck, Esq.